**This order is SIGNED.**

**Dated: December 19, 2017** 



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>ADAM L. PEEPLES and<br>JENNIFER K. PEEPLES,<br><br>        Debtors. | Bankruptcy Number: 14-23970<br><br>Chapter 7<br><br>Hon. R. Kimball Mosier |
| ADRIAN J. LEE and<br>ANGELA L. N. LEE,<br><br>        Plaintiffs,<br><br>v.<br><br>ADAM L. PEEPLES and<br>JENNIFER K. PEEPLES,<br><br>        Defendants. | Adversary Proceeding No. 14-2236 |

## MEMORANDUM DECISION

Adrian J. and Angela L. N. Lee don't believe that Adam L. and Jennifer K. Peeples should be able to discharge the debt they owe to the Lees. The Lees have been tenacious in their efforts to prevent the Peepleses from discharging that debt and have accused the Peepleses of many wrongs. But after hearing all of the evidence presented over three days of trial, the Court

has concluded that the Lees' claims amount to nothing more than a tempest in a teapot, and the

Peepleses will be granted their discharge.

## I. JURISDICTION

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334. This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) & (J), and this Court may enter a

final order. Venue is proper under the provisions of 28 U.S.C. § 1408 and § 1409.

## II. PROCEDURAL BACKGROUND

The Lees commenced this action against the Peepleses seeking to have the debt owed to

them excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4)[1] and seeking to deny

the Peepleses' discharge under § 727(a)(2), (a)(3), (a)(4), (a)(5), and (a)(6). During the pendency

of these proceedings the Lees have consistently maintained that the Peepleses have engaged in a

pattern of fraud and deception continuing into this bankruptcy case and the Peepleses should be

denied the relief afforded by the Bankruptcy Code.

The Lees and the Peepleses are representing themselves. Although Mr. Lee is an attorney

and he is representing Mrs. Lee, he has acknowledged to the Court that he is not a litigator.

Because the parties are not represented by skilled litigation counsel, the Court has been forced to

wade through procedural deficiencies and overreaching. For example, some facts were

established by admission as a result of the Peepleses' failure to respond to improper requests for

---

[1] Unless otherwise noted, all subsequent statutory references are to title 11 of the United States Code.

admission propounded by Mr. Lee. Rather than obviating the need to prove facts that the

Peepleses did not substantially dispute,[2] Mr. Lee principally used his requests for admission in an

attempt to establish the elements of his case by getting the Peepleses to admit to disputed and

potentially damaging facts. Instead of using more laborious means, Mr. Lee took an improper

shortcut in using the requests to establish contested facts. What's more, many of the requests

were simply speculations and others sought admission of legal conclusions, but the Court

allowed most of them to stand because they did not hinder the presentation of the merits of the

action.

There were two requests, however, that the Court permitted the Peepleses to withdraw

their answers to because there was no factual basis for the requests and the admissions could be

prejudicial to the Peepleses. Specifically, the Lees asked the Peepleses to "[a]dmit that the

collective value of silver bullion and/or revenue obtained by the sale thereof remaining in your

possession at the time you filed for bankruptcy exceeds $10,000," and to "[a]dmit that the

collective value of the coin collection and doll collection remaining in your possession at the

time you filed for bankruptcy exceeds $1000."[3] In hearings on Mr. Lee's requests for admission

he admitted that his evidence of the $10,000 figure was sketchy. His basis for the $1,000 figure

was his viewing an approximate number of Barbie dolls at the Peepleses' residence before they

filed bankruptcy and looking up values for Barbie dolls on eBay. Mr. Lee admitted that he did

---

[2] "Rule 36 is not a discovery device. The purpose of the rule is to reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact." *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997).

[3] Docket No. 139, at 5-6 and Docket No. 140, at 5-6.

not know how many of those dolls the Peepleses had when they filed bankruptcy. Because these requests for admissions lacked foundation and the dollar values were simply fabricated, the Court permitted the Peepleses to withdraw their answers to these admissions.

### III. FINDINGS OF FACT

Although some factual findings relate to both the Lees' § 523 and § 727 claims, the Court will organize the facts by dividing them between those that primarily relate to the § 523 claims and those that primarily relate to the § 727 claims. Notwithstanding the organization of the factual findings, all factual findings are equally binding as to all claims.[4]

#### A. Facts Relating to the § 523(a) Claims

The Lees owned a house located at 2096 Country Pine Cove, Holladay, Utah (House). In February 2009, the Lees decided to purchase, and move to, another home. Although it may have been an opportune time for the Lees to purchase a home, it was an inopportune time to sell the House.

The Lees attempted to sell the House for six months, but received little interest and no offers. Although the Lees would have preferred to sell the House, due to concerns about owing money on two large homes in the middle of the housing crisis, they decided to lease the House. The Lees leased the House from November 2009 through June 2010. Feeling less economic strain, the Lees did not rent the House for the remainder of 2010 or 2011, but attempted to sell it

---

[4] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable in adversary proceedings by Fed. R. Bankr. P. 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

again. In early 2012, after their failed efforts to sell the House, and "in order to try to stir up interest," the Lees advertised the House for lease with an option to buy on KSL.com, "hoping to attract someone that couldn't initially afford to purchase but maybe could start getting used to the neighborhood and save up and then possibly purchase after a few months."[5]

Shortly thereafter, on Saturday, February 25, 2012, Mr. Peeples meet with the Lees. He arranged to see the House with Mrs. Peeples on Sunday, February 26, 2012 and they signed the lease that day. The lease term began on February 28, 2012 and was to expire on February 28, 2013, with a monthly rent of $3,000 due on the 28th of each month. Prior to moving into the House, the Peepleses paid the Lees the first month's rent and an additional $3,000.00 security deposit in cash. The Lees did not ask the Peepleses for any references, and there was no evidence that the Lees requested a credit report or investigated the Peepleses' leasing history. The Lees did ask Mr. Peeples what line of work he was in, and he informed them that he was in the coin business, specifically the sale of Silver Eagle coins.

The Peepleses moved into the House with their five children[6] and timely paid rent on or about March 28, April 28, and May 28, 2012. Each month the rent was paid by cashier's check. The controversy between these parties began when the Peepleses failed to pay the June 28, 2012 rent payment when it was due. Although the Peepleses told the Lees that they had mailed a cashier's check for the June rent payment on June 26th, the admitted fact is that the Peepleses

---

[5] Trial Transcript for June 27, 2017, at 272:17-20.

[6] *See* Ex. 7, at Bates number L0001179.

5

neither obtained nor sent any cashier's check to the Lees to pay rent due on June 28th.[7] Between

June 28th to July 8th there were at least 20 text messages exchanged between the parties

regarding the missing payment. On June 30th, Mr. Lee suggested that the check might have been

lost in the mail. The following day, Mr. Peeples agreed that the check should have arrived and

indicated he would check with the post office in the morning. On July 2nd, Mr. Peeples stated

that the Postal Service was looking into the matter. For the first time he suggested that the check

may have been stolen from their outgoing mail. Later on July 2nd, Mr. Lee informed Mr. Peeples

that the check had not arrived that day, and Mr. Peeples responded that they had a "case" with the

post office and this was a "large loss" for them. Mr. Lee responded quickly, stating that the

Peepleses should be able to cancel the cashier's check.

After the cashier's check didn't arrive on July 3rd, Mr. Lee texted Mr. Peeples and again

suggested that the Peepleses cancel the cashier's check or inquire with their bank to see if

someone else had cashed it and also requested that they keep the Lees informed on the status of

the lease payment. Mr. Peeples's response was vague: "Exactly, thankyou, [sic] will do," but

there is no evidence that he or Mrs. Peeples canceled a cashier's check or inquired at the bank

regarding whether one had been cashed. On July 6th, Mr. Lee asked for an update from Mr.

Peeples. Five hours passed without a response, and Mr. Lee sent him the following text message:

> Your long silence on this sensitive matter is becoming a serious concern. We need
> assurances that you are dealing with us in good faith. Timely reports are what is
> required for us to have such assurances given that you are in default on the lease,
> and we have been willing to work with you.

---

[7] This fact was established through the Lees' requests for admission and was included in
the pretrial order as an uncontroverted fact. *See* Docket No. 222, at 4.

Mr. Peeples did not respond to this text message either, and Mr. Lee's growing concerns about the Peepleses' good faith led him to visit the House on July 7th. He spoke with Mrs. Peeples, who repeated the story that the check had been left in the outgoing mail and was feared stolen. According to Mr. Lee, Mrs. Peeples appeared under stress, and her demeanor caused him to believe the story and put to rest his concerns about the Peepleses' good faith. Mr. Lee testified that he "no longer had a concern after that [visit]."[8] By July 8th, the parties had reached a new arrangement for rent: the parties agreed that the Peepleses could make up the June 28th payment by paying $4,000.00 in July, August, and September.

Unfortunately, the Peepleses failed to make the July 28th lease payment. This time there was no representation that the payment had been sent; the Peepleses simply informed the Lees that they would be late on that month's payment. They scrambled to scrape together some money and did make a handful of minor, fractional payments toward the July 28th lease payment. The Peepleses paid $380.00 on July 30th, $500.00 on July 31st, and $150.00 on August 1st. After these payments were made Mr. Lee texted Mr. Peeples that $2,970.00 was the balance due for the July payment.[9] On August 2nd, he urged the Peepleses to pay as much as they could because a 10% penalty would be assessed the following day. On August 3rd, Mr. Lee assessed that penalty, bringing the balance due to $3,069.00. Two days later,  Mr. Peeples told Mr. Lee that he would get him the money as soon as he had it. That same day, Mr. Lee asked Mr. Peeples if the Peepleses had any property they could use as collateral to secure the lease payments since the

---

[8] Trial Transcript for June 27, 2017, at 254:7-8; *see also id.* at 199:12-200:12 (relating the details of Mr. Lee's visit with Mrs. Peeples on July 7th).

[9] This amount was reduced to $2,790.00 on August 3rd based on a $180 credit for repairing the garage door.

Lees had effectively lost the protection of the security deposit. Mr. Lee also suggested that

eviction would be less likely if the Peepleses could offer collateral. Mr. Peeples's response did

not address the Lees' request for collateral but vaguely indicated that money for the lease

payment would be forthcoming as soon as coin sales were processed. The text response also

refers to a mortgage broker, states that the Peeples want to make "a fair offer on the house," and

inquires how firm the Lees are on the price of the House, evidencing that the parties had

discussed the Peepleses' purchase of the House.

As it turns out, even though the Peepleses were behind on their rent, Mr. Lee began an

email exchange with them on August 5th regarding the purchase of the House. In subsequent text

messages and emails, most notably on August 10th and August 13th, the parties negotiated the

terms of a potential sale. Two main sticking points were the purchase price and how to deal with

the unpaid rent. Regarding the former, the Peepleses doubted that the House was worth what the

Lees were asking for in that market, while the Lees maintained that the price was reasonable in

light of an offer they received in July 2011 that later fell through. With respect to the latter

sticking point, the Peepleses wanted to have the security deposit returned, be released from the

lease, and have the Lees waive any outstanding lease payments as part of a sale. During these

negotiations the Lees expressed wariness about entering into a purchase contract while the

Peepleses were delinquent on their lease: "We do not think it wise to enter into a future contract

with someone who is in active breach on a previous contract with us."[10]

In the meantime, the parties continued to exchange numerous text messages regarding

payment of rent. On August 15th, Mr. Lee inquired about the unpaid rent and reminded the

---

[10] Ex. 7, at Bates number L0001172.

8

Peepleses that they were 2½ weeks overdue on rent, that the balance due was $3,087.16, and

another $4,000.00 would be due in under two weeks. On August 16th at 5:00 p.m. Mr. Peeples

informed Mr. Lee that their circumstances—i.e., income—had changed and they could not afford

the rent they had agreed to pay. At 5:51 p.m., Mr. Lee informed Mr. Peeples that the overdue

balance must be in the Lees' bank account by noon the next day or the Lees would enforce the

default against them. At 7:30 p.m. Mr. Lee proposed a solution to the rent issue that tied into the

purchase of the House: the purchase price for the House would be $655,000.00 and the Peepleses

would get a $10,000.00 credit on unpaid rent. Mr. Peeples texted his assent, and at 8:02 p.m., the

Lees stated they would have their attorney draw up a contract to sell the House to the Peepleses.

The parties entered into a Real Estate Purchase Contract (REPC) with an effective date of

August 25th, 2012. The purchase price was $655,000, and the Peepleses would receive a $13,000

credit at closing toward the purchase price for their "security deposit and rent paid under current

leasing arrangements." Closing was to occur by October 8, 2012, and the Peepleses were to

obtain financing by September 27, 2012.

There was also a "side agreement" signed by the parties at the same time as the REPC,

which related to the treatment of the Peepleses' rent obligation. In pertinent part, that agreement

provided:

> 3. Notwithstanding the REPC, [the Peepleses] are still required to honor their
> Lease with [the Lees] regarding the [House], which Lease will be terminated if,
> and only if, [the Peepleses] actually purchase the [House] from [the Lees]
> pursuant to the REPC.
>
> 4. If [the Peepleses] actually close on the purchase of the [House] from [the Lees],
> then at or prior to Closing, [the Peepleses] shall pay [the Lees] the sum of Seven
> Thousand Seven Hundred Ninety Dollars ($7,790), plus an additional One

Hundred Dollars ($100) per day for every day after September 28, 2012 until the
closing actually occurs, as rent for the [House] through the date of closing.

The Peepleses made one attempt to obtain financing and submitted a mortgage loan

application to Republic Mortgage Home Loans on September 11, 2012. Other than the Peepleses'

statement with respect to their income, there is no financial information contained in the loan

application. There was no evidence offered or received to corroborate the income the Peepleses

represented on the application. After reviewing the Peepleses' credit record, Republic Mortgage

denied their loan application the same day it was submitted. On September 26th, Mr. Lee sent the

Peepleses an email reminding them of the funding commitment deadline. On September 27th the

Peepleses sent notice that they were canceling the REPC. That same day Mr. Lee sent the

Peepleses notice that the lease was back in effect and the amount of $11,937.32—constituting

rent for July through September plus late fees and interest—was due immediately. By October 9,

2012, the Lees had initiated an unlawful detainer action and completed service of process on the

Peepleses. The Peepleses vacated the House on or around October 11, 2012, and by November 1,

2012 their primary residence had become 2198 East Atkin Ave. The Lees obtained a default

judgment in the amount of $48,665.20 on their unlawful detainer action on December 4, 2012.

## B. Facts Relating to the § 727 Claims

In an effort to collect on their judgment, the Lees initiated supplemental proceedings. The

Peepleses had actual prior notice of supplemental hearings scheduled on May 8, 2013, June 12,

2013, and August 14, 2013. They made an active choice not to attend these scheduled hearings

and actively attempted to avoid service of the court orders scheduling these hearings. The

Peepleses moved in with Mr. Peeples's mother in August 2013. On September 6, 2013 the Lees

obtained an additional default judgment in the amount of $88,727.54 for alleged communications fraud.

The Peepleses filed a joint petition for bankruptcy on April 17, 2014. They filed statements and schedules on April 29, 2014, which have not been amended since that time. The Peepleses were represented by counsel when they filed their bankruptcy case and are still nominally represented in the main case.[11]

### 1. Silver Eagle Store[12]

Mr. Peeples conducted a business known as Silver Eagle Store, which was primarily involved in online sales of Silver Eagle coins.[13] He purported to sell 2012 Silver Eagle coins and received payment for the same, but failed to ship any Silver Eagle coins.[14] Mrs. Peeples was employed by Silver Eagle Store in 2012,[15] but there was no evidence regarding the amount of

---

[11] The Peepleses' attorney represented them initially in this adversary proceeding, but withdrew on February 10, 2015. The Peepleses made their appearance as *pro se* defendants shortly thereafter. They are effectively *pro se* in the main case as well, although little has happened in that case in the past two years: the trustee filed a no asset report in December 2014, and transcripts of the Peepleses' § 341 meeting and Rule 2004 exam were entered on the docket in November 2015.

[12] The name of this entity has alternatively been rendered as "Silver Eagles Store," *see* Exs. 22 & 34, and "Silver Eagles Stores," *see* Docket No. 222, while Mr. Lee frequently referred to it as "Silver Eagle Stores." For the sake of consistency, the Court will refer to it as "Silver Eagle Store," which was how the Peepleses rendered it on their Statement of Financial Affairs and how Mr. Peeples referred to it at trial. In any event, the various renderings refer to the same entity.

[13] Docket No. 222, Pre-Trial Order, at 3.

[14] Mr. Peeples disputed this fact at trial but he had previously admitted it in connection with Mr. Lee's requests for admission.

[15] Although Ex. 28 reflects that the Peepleses derived some income from the purported sale of 2012 Silver Eagle coins, there is insufficient evidence to deduce, even approximately, how much income they derived from that activity.

salary or income she received from Silver Eagle Store. The Peepleses maintained PayPal

accounts related to or involved with Silver Eagle Store's business activities. There were a total of

five PayPal account records admitted into evidence. Although the Peepleses admitted that the

PayPal account records offered into evidence were records of their PayPal accounts, the records

are confusing without the benefit of testimony and explanation by someone with personal

knowledge of them. Because of a lack of foundation, personal knowledge, or expertise, the

PayPal account records were admitted for the limited purpose of establishing the existence,

duration, and general activity of the accounts.[16]

The Peepleses depleted the balance of the PayPal accounts prior to complaints of

non-delivery, and did not make any entity whole as a result of this activity.[17] Mr. Peeples kept,

but lost, records of Silver Eagle Store.[18]

The evidence failed to establish the amount the Peepleses received from the operation of

Silver Eagle Store,[19] and there was no reliable evidence to establish that the amount the Peepleses

received from Silver Eagle Store was significant. Mr. Peeples testified that his business was

successful but he also testified that he did not make a profit. Although the Court does not find

---

[16] Mr. Lee attempted to introduce summaries of certain of the accounts, which he had prepared. *See* Exs. 42, 43, and 59. Because Mr. Lee was not competent to testify as a fact witness with respect to those records, and because the exhibits were not summaries but selected entries, the Court refused to admit those summaries or permit Mr. Lee to testify as to particular transactions.

[17] Docket No. 222, Pre-Trial Order, at 3.

[18] *Id.* at 5.

[19] The Peepleses' eBay account was not offered into evidence, and the PayPal accounts were admitted for a limited purpose and did not establish the amounts the Peepleses actually received.

Mr. Peeples's testimony credible, that does not establish that his business was successful. In fact, the evidence is that his business was neither successful nor significant. In March 2012, Mr. Peeples received $20,000.00 from an individual named Evan Twede. The funds received from Mr. Twede were a loan and not from the sale of Silver Eagle coins, and Mr. Peeples repaid that amount, plus an additional $2,000.00, within a short time.

### 2. The Barbie Doll Collection

One of the Lees' allegations is that Mrs. Peeples failed to disclose a valuable Barbie doll collection on her statements and schedules. Mrs. Peeples started playing with Barbie dolls when she was nine or ten and began collecting them at that time. In 2012, she owned approximately 70-100 Barbie dolls, but she sold most of them in September 2012 in an effort to generate cash for the Peepleses' financial needs. When the Peepleses filed bankruptcy, she owned 16 Barbie dolls. Some of these dolls were gifts from her mother, and there was no evidence that nine of these dolls had any significant market value. The other seven dolls were appraised by Franklin Colletta, the Lees' expert witness. Mr. Colleta acknowledged that he had never personally inspected the dolls and relied on Mr. Lee's description of the dolls' condition and the photos provided by Mr. Lee to appraise them. There was no evidence that established what information Mr. Lee communicated to Mr. Colletta regarding the dolls' condition. It is undisputed that the seven dolls were not in pristine condition; they had been removed from their original boxes, had been displayed outside of the boxes, and handled extensively.

Mr. Colletta's opinion was that the seven Barbie dolls he appraised had a combined fair market value of $1,175.00.[20] Mr. Colletta failed to articulate a clear methodology for valuing the

---

[20] *See* Ex. 61.

seven dolls. He clearly explained the nature and collectibility of Barbie dolls that have never been removed from their original box (NRFB) and are in pristine condition, but he failed to articulate and explain the market for Barbie dolls that are not in pristine condition. In particular, he failed to describe the factors that should be considered and how those factors affect the value of Barbie dolls that are not in pristine condition. In addition, he also failed to clearly articulate whether the values of the comparables he relied on were completed sales or asking price.

The valuation of the doll known as the "Lady of the Manor Silkstone Barbie" illustrates the problem this Court has with Mr. Colletta's appraisal. Mr. Colletta stated that Mrs. Peeples's Lady of the Manor Silkstone Barbie had been removed from the box and that the box was not in very good condition, and he testified that he had five comparables for this doll. One comparable was from the Barbie Collection: the doll was in good condition but did not have a box, and the asking price was $119.00. Another comparable was from amazon.com: the doll was NRFB and had an asking price of $455.00.  The third comparable was from walmart.com: the condition was never stated on the record, but the asking price was $586.00. The fourth comparable was from eBay: the doll was NRFB and the sale price was $350.00. The final comparable was also from eBay: the doll was "nude," that is, it had no box, accessories, or outfit, and the sale price was $125.00. It is clear there is no direct comparable to Mrs. Peeples's Lady of the Manor Silkstone Barbie doll. Even though Mrs. Peeples's doll had been removed from its box, and the box was not in very good condition, Mr. Colletta valued it at $350.00, which was the same amount as the price actually paid for an NRFB doll on eBay. There was no explanation of any factors that Mr. Colletta considered or how those factors affected the value of this doll in arriving at his valuation of $350.00.

Another example of Mr. Colletta's questionable methodology is his valuation of the "In the Pink Silkstone Barbie." This doll had been broken in half at the waist and twice glued back together. Mr. Colletta did not know the exact nature of the damage to the doll—Mr. Lee had apparently told him only that the doll was in "good repaired condition" in its original box. Based on that information and the photos of the doll, Mr. Colletta assigned it three values: $350.00 if it were NRFB, $175.00 if it were undamaged, and $100.00 in its present condition. First, there was no evidence that the designation "good repaired condition" encompasses a doll that was broken in half and twice glued back together, so it is not clear that Mr. Colletta relied on accurate information when he valued this doll. Second, Mr. Colletta did not attempt to explain why this damaged doll would have any value at all to Barbie doll collectors, much less a value of $100.

Mr. Colleta also appraised 20 of the dolls that Mrs. Peeples sold in September 2012. He opined that those 20 dolls had a combined fair market value of $3,150.00. Mr. Colletta obviously did not personally inspect these dolls.

The Peepleses did not have their own expert, but Mrs. Peeples did challenge Mr. Colletta's appraisal in meaningful ways, including his methodology. Specifically, she testified that "how he went about to come up with those values isn't any different than what I could have done and could have done more extensively."[21] Essentially, Mrs. Peeples contended that Mr. Colleta's opinion was not based on specialized knowledge and was not the product of reliable principles and methods. She also challenged the comparables used by Mr. Colletta, who failed to personally inspect the dolls, but relied on Mr. Lee's description of the dolls, and failed to take into account other factors that could affect value, such as dust accumulation on the dolls' outfits

---

[21] Trial Transcript for June 28, 2017, at 433:25-434:2.

and accessories. Mrs. Peeples also testified that she disputed Mr. Colletta's valuation because she had in fact purchased the dolls for much less. In particular, she disagreed with Mr. Colletta on the Lady of the Manor doll. The box for Mrs. Peeples's Lady of the Manor doll had a price tag of $69.99,[22] and the doll had been removed from its box, but Mr. Colletta valued it at $350.00.

The Court did not find Mr. Colletta's testimony helpful in determining the value of the specific Barbie dolls at issue. Mrs. Peeples did not opine as to the value of the dolls but did testify that she paid much less for the dolls and had not been able to sell similar dolls, including the 20 Barbie dolls from the September 2012 sale that Mr. Colletta appraised, for any significant value. Although Mr. Colletta's testimony was admitted because the Peepleses did not object to him testifying, the Court gives little weight to his testimony.

Based on the evidence presented at trial, the Court finds that the value of Mrs. Peeples's Barbie dolls is very low, perhaps no more than that of used toys, and there is no credible evidence that enables the Court to establish a higher value.

### 3. Additional Facts Related to the § 727 Claims

On June 11, 2012, Jennifer Peeples applied for a loan with Check N' Go.[23] Other than Mrs. Peeples's statement with respect to her income, there is no financial information contained in the loan application. There was no evidence offered or received to corroborate the income the Peepleses represented on the loan application. Her loan application was denied.

Because they failed to respond to the Lees' requests for admission, the Peepleses admitted that at least a portion of the monies or assets Mr. Peeples obtained by his activity on eBay and

---

[22] The price tag lists three prices: a regular price of $139.99, a sale price of $129.99, and an "our price" of $69.99. Ex. 63, at Bates numbers L0004574-L0004577.

[23] *See* Ex. 24.

PayPal in 2012 were retained throughout 2013 and through 2014 until at least after the Peepleses filed bankruptcy. They also admitted that at least a portion of the monies or assets Mrs. Peeples obtained by her activity on eBay and PayPal in 2012 were retained throughout 2013 and through 2014 until at least after the Peepleses filed bankruptcy. But there was no evidence presented that enabled the Court to determine what monies or other assets had been retained or their value. They further admitted that Mr. Peeples was paid in 2013 as a result of work performed in tree care. The Peepleses testified that they owned some DVDs, a cheap computer, and household furnishings at the time they filed bankruptcy. The Statement of Financial Affairs filed in their bankruptcy case states that their car was repossessed in December 2012.

## IV. CONCLUSIONS OF LAW

### A. The § 523 Claims

#### 1. The § 523(a)(2)(A) Claim

The Lees' § 523(a)(2)(A) claim stems from the Peepleses' failure to make the June 2012 lease payment. The Lees argue that the Peepleses made two false representations: first, that the check for the June lease payment was in the mail and, second, that they had the financial wherewithal to purchase the House. The Lees' theory of this claim asserts that the Peepleses made these false representations to induce them to allow the Peepleses to remain in the House longer than they would have otherwise allowed. In turn, this caused harm to the Lees by preventing them from occupying the House or renting it out to another tenant.[24]

---

[24] The Lees have also asserted that the Peepleses paid their rent using money that was not "clean." Mr. Lee did not clarify this allegation at trial, but the Court infers, based on what the Lees previously argued in their motion for summary judgment, that the Lees may have been alluding to their belief that Mr. Peeples's coin sales through Silver Eagle Store were essentially a

The Tenth Circuit Court of Appeals has clearly stated the elements a party must prove to establish a claim under § 523(a)(2)(A).

> In order to establish a non-dischargeable claim under this subsection, a creditor must prove the following elements by a preponderance of the evidence: "The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."[25]

Failure to establish any one of these elements is fatal to the party's claim.

The Lees failed to establish two critical elements of their case, namely that their reliance on the Peepleses' statements was justified or that they suffered any damages as a result of the Peepleses' alleged false representations. As the Tenth Circuit has explained, a creditor's reliance must be justifiable from a subjective standpoint.

> The fourth element of the § 523(a)(2)(A) test requires the creditor's reliance to be "reasonable." The appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was "justifiable" from a subjective standpoint. In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases." Even under the "justifiable" test, however, the plaintiff must "use his senses" and at least make "a cursory examination or investigation" of the facts of the transaction before entering into it. Moreover, this test "does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt

---

fraud. *See* Docket No. 100. But Mr. Lee did not introduce any evidence showing that the Peepleses paid their rent using illicit funds or explain why such an allegation would be relevant to a claim under § 523(a)(2)(A). Therefore, the Court will not address this allegation further.

[25] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009) (quoting *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

18

about reliance in fact." In effect, "reasonableness goes to the probability of actual reliance."[26]

If a plaintiff "discovers a red flag that should warn him that he is being deceived," he must "make a more substantial investigation" in order to claim justifiable reliance.[27]

While the Lees may have initially been justified in relying on the Peepleses' representation that they had obtained and mailed a cashier's check for the June 28th rent, any continued reliance soon dissipated. When the check failed to arrive and the Peepleses did not follow through with Mr. Lee's suggestion that they inquire with their bank to cancel the check and recover the funds or see if someone else had cashed the check, that should have alerted the Lees that something was amiss. In short, Mr. Lee had identified an easy solution to a simple problem, but the Peepleses were reluctant to perform the exceedingly minor task of inquiring about and canceling a cashier's check. That unexplained reluctance should have sat uneasily with the Lees, who monitored the payment of rent assiduously and were sophisticated enough to know how easy it would be to cancel the check. In fact, the evidence shows that the Lees were concerned about the status of the rent and were keenly aware of the Peepleses' inaction. On July 6th, Mr. Lee sent a text message to Mr. Peeples stating that "[y]our long silence on this time sensitive matter is becoming a serious concern. We need assurances that you are dealing with us in good faith."[28] This text message, with its intimation that the Peepleses were not acting in good faith, suggests that the Lees began to doubt the Peepleses' story regarding the check.

---

[26]*Id.* at 791-92 (quoting *Field v. Mans*, 516 U.S. 59, 71, 74-76 (1995)).

[27] *Sheen Falls Strategies, LLC v. Keane (In re Keane)*, 560 B.R. 475, 489 (Bankr. N.D. Ohio 2016).

[28] Ex. 6, at Bates number L0001637.

Nevertheless, by July 8th the parties had reached a new arrangement for the Peepleses to pay June's rent by adding $1,000 to the rent payments for July through September. The Lees' version of events has it that Mr. Lee's visit to the House on July 7th completely allayed his concerns and led him to enter into the new arrangement in reliance on the Peepleses' representation that the cashier's check had likely been stolen from their outgoing mail. Based on the evidence presented, however, the Court concludes that the Lees' claimed reliance was not justifiable.

In order for reliance to be justifiable, a plaintiff must use his senses and at least make a cursory investigation of the facts. A plaintiff may not ignore red flags. Here, Mr. Lee had offered a simple solution to the Peepleses' problem: cancel the check and obtain a new one. Had the Peepleses followed that advice, it would have confirmed two things—that they had originally obtained a check and that they had the money to pay June's rent.[29] The Peepleses' silence and inaction suggested the opposite, and the Lees, using their senses, became skeptical of the Peepleses' story. But the visit to the House on July 7th does not turn that skepticism into justifiable reliance for two reasons. First, the Court does not find Mr. Lee's testimony that the visit assuaged his concerns about the Peepleses' good faith to be credible.[30] Second, however

_____

[29] If the Peepleses discovered that someone else had cashed the check, that would have confirmed the check's existence, and the Peepleses could have taken appropriate measures to attempt to have the money returned to them.

[30] Since both parties were *pro se*, the Court permitted them to present direct testimony through prepared statements. Mr. Lee's prepared statement regarding the July 7th visit carefully paints him as a trusting person who felt compassion for the Peepleses' plight after witnessing Mrs. Peeples's demeanor. Notwithstanding Mr. Lee's compassion, Mrs. Peeples did not give him any information he did not already have. The Court does not find Mr. Lee's prepared statement that the July 7th visit completely changed his mind about the Peepleses' good faith to be credible.

sincere Mrs. Peeples's story may have appeared, that visit failed to resolve the key question of

why the Peepleses were reluctant to cancel the check. Their reluctance was a red flag; it

suggested that the reason the Peepleses did not cancel the check was because there was no check

to cancel. The Lees were therefore required to perform a more substantial investigation of the

facts. They were sophisticated enough to offer a solution that, if followed, would have ferreted

out the cause of the Peepleses' reluctance, but they made no attempt to confirm the check's

existence. Having identified an easy and surefire method to verify whether the Peepleses were

telling the truth, the Lees cannot abandon that method and claim justifiable reliance simply

because they had sympathy for Mrs. Peeples. Justifiable reliance must be based on something

more than sympathy.

But even if the Court concluded that the Lees justifiably relied on the Peepleses'

representation regarding June's rent, the Lees were entitled to rely on it only until the next

month's rent came due. By July 28th, new information came to light regarding the Peepleses'

finances such that any continued reliance on their prior representation that they had sent a

cashier's check was not justified and was no longer relevant. On July 27th, the Peepleses

candidly acknowledged in a text message that they did not have the money to pay the July 28th

rent, and that fact was also evidenced by their actions. They frantically and belatedly brought

over small payments for the July 28th rent as they acquired funds, which totaled slightly more

than a quarter of the $4,000 due for July. Although Mr. Peeples sent Mr. Lee an oblique text

message on August 2nd that appears to suggest Mr. Peeples canceled the cashier's check,[31] that

---

[31] The relevant portion of the text message reads: "I did call [C]hase n they did say its
[sic] a 90 day wait n we have to wait since we canceled [sic] it." Ex. 6, at Bates number
L0001642. There is no antecedent for "it" in Mr. Peeples's text message or the preceding text

does not make the Lees' reliance justifiable. Even if the Peepleses had canceled the check a

month earlier, their actions clearly demonstrated that they were struggling to scrape together

$1,000 to put toward their rent.

The Lees assert that they believed, at the time, that the rent deficiency was due to the loss

of the cashier's check—despite having failed to confirm its existence—and a drop in precious

metal prices that affected the Peepleses' business. According to the Lees, they thought this cash

flow problem was temporary and remained confident that the Peepleses would be able to meet

their rent obligations through liquidation of some assets, which the Lees believed to be

significant despite having no basis for holding that belief. But the Peepleses' financial troubles

were not temporary, and they did not have sufficient assets to liquidate to pay the rent. By the

middle of August, Mr. Peeples informed Mr. Lee that his circumstances had changed and he

could no longer afford to pay the agreed rent.

On August 16th, Mr. Lee informed the Peepleses that the past due rent must be paid by

noon the next day. Less than three hours later, the Lees agreed to enter into a REPC to sell the

House to the Peepleses for $655,000. The Lees are sophisticated people. Mr. Lee is highly

educated. The Court was able to observe Mrs. Lee when she testified. Although her testimony

was not persuasive on critical elements, her testimony was very articulate. The Lees have

purchased at least two homes and are familiar with the general requirements to obtain financing,

including the requirement for a down payment and verification of income. They intentionally

---

exchanges, and Mr. Lee did not acknowledge this piece of information in subsequent text
messages, so it is not clear from the immediate context what "it" means. Only when one
considers the text messages between Mr. Lee and Mr. Peeples as a whole could one conclude that
"it" refers to the cashier's check.

leased the House to "someone that couldn't initially afford to purchase but maybe could . . . save

up and then possibly purchase after a few months." The Peepleses initially appeared to be exactly

the type of tenant the Lees had waited three years for, but by August it was apparent that they

were not. The Lees were well aware that the Peepleses could not afford to pay the rent they had

agreed to and that their financial circumstances had taken a turn for the worse. There was no

justifiable basis for the Lees to believe that the Peepleses had saved any money, could obtain the

requisite down payment, or establish sufficient income to obtain financing. Any reliance on the

Peepleses' alleged representation that they could qualify for a loan to purchase the House was

clearly not justified.

The Lees also failed to introduce evidence to establish damages from their alleged

reliance on the Peepleses' representations. While the two default judgments the Lees obtained

against the Peepleses in state court were introduced into evidence,[32] the Lees made no effort to

establish any causal connection between the Peepleses' alleged fraudulent representations and

these judgments. Additionally, damages cannot be based on these default judgments because the

merits of the claims that resulted in those judgments were never adjudicated in state court and

have no collateral estoppel effect. While collateral estoppel precludes a debtor from relitigating

the factual issues underlying the dischargeability of a § 523(a)(2) debt that have been litigated in

state court,[33] "collateral estoppel treats as final only those questions actually and necessarily

---

[32] *See* Exs. 67 & 68.

[33] *Nelson v. Tsamasfyros (In re Tsamasfyros)*, 940 F.2d 605, 606 (10th Cir. 1991).

decided in a prior suit."[34] A default judgment is not an adjudication of the merits of a claim.[35] There is no evidence that any factual issues that would support a § 523(a)(2) claim were raised, let alone litigated, in the state court actions. Accordingly, the default judgments do not establish that the Peepless' alleged fraudulent representations caused damage to the Lees. Because the Lees failed to carry their burden of proof on two elements of their § 523(a)(2)(A) claim, the Court will enter judgment for the Peepleses on that claim.

### 2. The § 523(a)(4) Claim

The Lees' § 523(a)(4) claim merits little attention. Although the Lees pleaded such a claim and it was included in the pretrial order, they omitted it from their pretrial brief and indicated that they would not focus on that claim at trial. That proved accurate: the Lees failed to introduce any evidence with respect to this claim. The gist of the § 523(a)(4) claim in the complaint was that the Lees had permitted the Peepleses to retain funds that otherwise would have been paid toward rent so that the Peepleses could accumulate a down payment to purchase the House. Because those funds constituted rent payments, they belonged to the Lees. And when the Peepleses retained that money and did not use it to make the down payment or otherwise return it to the Lees, they allegedly committed embezzlement or larceny. The Lees did not even attempt to articulate any legal basis for their claim that failure to make the down payment or pay rent constitutes embezzlement or larceny, and they presented no evidence of a taking, an element of both larceny and embezzlement. Because the Lees have not carried their burden of proof on their § 523(a)(4) claim, the Court will enter judgment for the Peepleses on this claim.

---

[34] *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979).

[35] *E.g.*, *Arizona v. California*, 530 U.S. 392, 414 (2000).

24

**B. The § 727 Claims**

Initially, the Court notes that "[t]he Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[36] The Lees' § 727 claims are principally based on the contention that the Peepleses had valuable assets that they concealed from the Lees and the trustee and that they had significant business transactions that they failed to keep record of. These contentions are primarily based on inferences, or more accurately speculations, and are not supported by the evidence.

**1. The § 727(a)(2) Claim**

Section 727(a)(2) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition.

Intent under § 727(a)(2) must be actual, and "may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[37] This provision "reinforces an affirmative

---

[36] *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 694 (10th Cir. 2014) (citation omitted).

[37] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (citation omitted).

prohibition against fraudulent transactions and other activities designed to injure creditors by denying access to potentially valuable assets."[38]

The Lees allege claims under § 727(a)(2)(A) and (a)(2)(B). The former claim asserts that the Peepleses concealed property from the Lees by failing to attend supplemental hearings in state court within the year prior to their bankruptcy case. The latter claim asserts that the Peepleses hid property after filing their bankruptcy case by failing to disclose it on their schedules. The Lees base their § 727(a)(2) claim on the admissions they obtained because the Peepleses failed to answer the Lees' requests for admission. The Lees obtained the Peepleses' admission that they had actual prior notice of each of the supplemental hearings on the unlawful detainer judgment, which were scheduled for May 8, 2013, June 12, 2013, and August 14, 2013; that they made an active choice not to attend any of those hearings; and that they actively attempted to avoid service of process for those hearings. The Lees also obtained the Peepleses' admission that at least a portion of the monies or assets Mr. Peeples obtained by his activity on eBay and PayPal in 2012 were retained throughout 2013, and through 2014 until at least after the Peepleses filed for bankruptcy, and at least a portion of the monies or assets Mrs. Peeples obtained by her activity on eBay and PayPal in 2012 were retained throughout 2013, and through 2014 until at least after the Peepleses filed for bankruptcy. These admissions are so vague and lacking in foundation and relevancy that it is impossible to determine, from these admissions alone, what assets were retained and whether the assets had any material value.

---

[38] *Davis v. Osborne (In re Osborne)*, 476 B.R. 284, 293 (Bankr. D. Kan. 2012) (quoting 4 *Norton Bankruptcy L. & Prac.*, § 86.4 (3d ed. 2012)).

As regards the § 727(a)(2)(A) claim, although the Peepleses' failure to appear at the supplemental hearings may permit the Court to infer an intent to hinder, delay, or defraud, it does not permit the Court to infer the existence of valuable property. The Lees had the burden to establish that the Peepleses owned and concealed such property, but there was no evidence presented that showed the Peepleses had any property other than some household furnishings, the Barbie dolls, some used DVDs, and a few other items of personal property of minimal value at the time of the supplemental proceedings. Although Mrs. Peeples did collect Barbie dolls, the evidence is that her collection was just a hobby. There was no evidence that Mrs. Peeples collected Barbie dolls because of their value. There was no competent evidence that enables the Court to conclude that the Barbie dolls had significant value or that they were being intentionally concealed. Similarly, the DVDs were not collected for value and there was no evidence that they had any significant market value or were being intentionally concealed. The evidence is that after June 2012 the Peepleses had very little property of value, if any, and very little income and were struggling financially. In June 2012, Mrs. Peeples applied for a sub-prime loan, but was denied. She sold most of her Barbie dolls in an effort to raise funds. The Peepleses' car was repossessed in December 2012. Without evidence that the Peepleses owned valuable property to conceal from the Lees in 2013, the Court concludes that their failure to attend the supplemental hearings is insufficient evidence to infer that they intended to hinder, delay, or defraud the Lees.

With respect to the § 727(a)(2)(B) claim, the failure to disclose property on one's schedules is a § 727(a)(4)(A) claim, and the Court will address it in Section IV.B.3, *infra.* To the extent such conduct is actionable under § 727(a)(2)(B), the Lees' claim would suffer from the

same problems as their § 727(a)(2)(A) claim. In short, the Lees produced no evidence to show

that the Peepleses owned and concealed valuable property when they filed bankruptcy.

### 2. The § 727(a)(3) Claim

Section 727(a)(3) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

> (3) the debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the debtor's
> financial condition or business transactions might be
> ascertained, unless such act or failure to act was justified under
> all of the circumstances of the case.

In order to deny a debtor's discharge under § 727(a)(3), the court must find that the debtor "failed

to maintain and preserve adequate records and that the failure made it *impossible* to ascertain [the

debtor's] financial condition and *material business* transactions,"[39] and that the failure was not

justified under all of the circumstances. The party objecting to discharge bears the initial burden

to show that the debtor's records are inadequate. Once that burden is met, the burden shifts to the

debtor to justify the lack of adequate records.[40] The Bankruptcy Code does not specify what

records must be kept, does not require that the records be kept in a particular manner, and does

not require that the records be impeccable.[41] Section 727(a)(3) doesn't even specify that the

---

[39] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997).

[40] *Hunt v. Steffensen (In re Steffensen)*, 534 B.R. 180, 196-97 (Bankr. D. Utah 2015).

[41] *See Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008) ("The statute does not require absolute completeness in making or keeping records."); *Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711, 718 (Bankr. D. Colo. 2013) ("Section 727(a)(3) does not require a debtor to provide perfect or even complete records."); *Pu v. Mitsopoulos (In re Mitsopoulos)*, 487 B.R. 604, 611-12 (Bankr. E.D.N.Y. 2013) ("The debtor

debtor must create the records himself. Instead, "[i]t is a question in each instance of reasonableness in the particular circumstances."[42] "The test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt and his business transactions for a reasonable period in the past may be ascertained."[43]

The only business transactions at issue in this case relate to Silver Eagle Store. Through their requests for admission, the Lees obtained Mr. Peeples's admission that he kept, but failed to preserve recorded information of Silver Eagle Store's business activities, and that without such records, it is impossible for the Lees to determine the Peepleses' financial condition. This admission is nothing more than a recitation of the statutory language found in § 727(a)(3). The admission fails to establish any relevant time period and seeks admission of the legal conclusion that it is impossible to determine the Peepleses' financial condition. The Lees also obtained the Peepleses' admission that in March and November 2012 the Peepleses derived income from the purported sale of 2012 Silver Eagle coins, failed to ship the coins despite collecting revenue from the sales, depleted the balance of their PayPal accounts prior to complaints of non-delivery, and made no entity whole as a result of the activity.

But there are, in fact, records of Silver Eagle Store's business transactions. The Lees introduced into evidence business records that were created and maintained by PayPal, eBay, and several banks. Although these records, and the PayPal records in particular, cannot be fully

---

is not required to keep an impeccable system of bookkeeping, or to maintain records so complete that he can satisfy an expert in business.") (citation and internal quotation marks omitted).

[42] *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (citation and internal quotation marks omitted).

[43] *Id.* (citation and internal quotation marks omitted).

explained without the testimony of a competent witness, the Court is convinced that the

Peepleses' business transactions relating to Silver Eagle Store can be ascertained from these

records.[44]

Whether Mr. Peeples's failure to deliver Silver Eagle coins to purchasers was fraud or

merely a failed business plan is not relevant in this case. What is relevant is whether there were

material financial transactions that cannot be determined and whether there may be assets

remaining from those transactions. Although Mr. Peeples lost the ledger that he kept for Silver

Eagle Store, the records of the store that third parties maintained document the Peepleses'

material business transactions and financial condition. And what the evidence clearly shows is

that Silver Eagle Store was a short-lived, unsuccessful business venture that conducted no

business for more than a year and a half before the Peepleses filed bankruptcy.

Even assuming, for the sake of argument, that the Lees had carried their initial burden to

show the inadequacy of the Peepleses' records, the Court is satisfied that the Peepleses' failure to

personally maintain copies of Silver Eagle Store's account records is justified. Given the state of

information technology and business practices, it is reasonable for the Peepleses to assume these

---

[44] Interestingly, and contrary to their assertion that it is impossible to determine the Peepleses' financial condition, the Lees contend that these business records enable them to ascertain what the Peepleses' business transactions were. The picture that Mr. Lee attempted to paint was that Mr. Peeples obtained large sums of money through Silver Eagle Store by defrauding individuals but had failed to keep records of these significant financial transactions. The Court did exclude exhibits 42 and 43, which were Mr. Lee's summaries under Fed. R. Evid. 1006 of the Peepleses' PayPal accounts. But even if those summaries had been admitted it makes no difference in the end. Those summaries show that in March 2012 Mr. Peeples received $18,036.19 from the sale of Silver Eagle coins and $4,436.00 for an "unspecified purpose" for total receipts of $22,472.19. Evan Twede was paid $22,000.00 from this account. According to Mr. Lee's summary of Mrs. Peeples's account, in November 2012 she received approximately $9,120. There were numerous debit card purchases that depleted the PayPal account before the end of November.

electronic records were available to them. In fact, there is no evidence that they ever received

these business records in any format other than in electronic format. It is not unreasonable for a

debtor to rely on the third party that created the financial records to preserve those records for a

reasonable time.[45]

### 3. The § 727(a)(4) Claim

Section 727(a)(4) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

(4) the debtor knowingly and fraudulently, in or in connection
with the case–
(A) made a false oath or account.

"In order to deny a debtor's discharge pursuant to [§ 727(a)(4)(A)], a creditor must

demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made

an oath and that the oath relates to a material fact."[46] Not all false statements occasion denial of

discharge, however. "A debtor will not be denied discharge if a false statement is due to mere

mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for

denial of discharge."[47]

---

[45] *See Chase Bank USA, N.A. v. Ritter (In re Ritter)*, 404 B.R. 811, 834 (Bankr. E.D. Pa.
2009) (concluding that the debtor was justified in failing to personally maintain copies of account
records for three credit cards because it was "fair for the Debtor to assume that, regardless of
whether she maintained a set of past statements, her account information would nonetheless still
exist in electronic form and be retrievable—at least for a reasonable period of time").

[46] *In re Brown,* 108 F.3d at 1294.

[47] *Id*. at 1294-95 (citations omitted).

31

Although the Lees allege that the Peepleses "made numerous omissions and material misstatements on their financial disclosures,"[48] with the exception of the Barbie doll collection, they failed to clearly identify these alleged omissions and misstatements. The Court will nevertheless address the litany of allegations raised in the Lees' complaint, their motion for summary judgment, their pretrial brief, and the disputed issues of fact stated in the pretrial order.

The Lees' principal allegation is that the Peepleses "failed to divulge numerous assets that they possessed at the time that they filed for bankruptcy." Mr. Lee spent considerable time examining Mr. and Mrs. Peeples about their failure to specifically identify property in response to directive "5" on Schedule B. That directive on the Schedule B form that was in effect when the Peepleses filed bankruptcy instructed debtors to provide a description and location of any "[b]ooks, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles," and the "current value of debtor's interest in [that] property without deducting any secured claim or exemption." In response to that directive, the Peepleses listed "[b]ooks, pictures, collectibles, wall hangings, knick knacks [sic], etc." and assigned them a cumulative value of $20.00.

Mr. Lee focused on the Barbie dolls, but he also elicited testimony that the Peepleses had a collection of DVDs[49] and a laptop computer when they filed bankruptcy, which were not

---

[48] Docket No. 227, Plaintiffs' Pretrial Brief, at 11.

[49] It is unclear precisely how many DVDs the Peepleses had in their collection, but the evidence established approximate numbers. Mr. Peeples testified that he thought the collection comprised more than 40 but fewer than 100 DVDs, while Mrs. Peeples gave a more precise figure: between 50 and 75.

specifically identified on Schedule B.[50] Mr. Lee did not elicit any testimony to establish a value

for these items as of the petition date, but the Peepleses did testify that they believed these items

had very little value. They bought the laptop in early 2012 for approximately $200.00, and the

DVDs were primarily children's movies and were purchased at a thrift store or pawnshop for $1

or $2 apiece. Mr. Lee contends that the Peepleses' description "collectibles" does not, and

cannot, include the Barbie dolls and DVDs because the value of these assets must exceed $20.00.

And here we get to the heart of the matter. Mr. Lee expects the Court to draw unwarranted

inferences and conclude that the Peepleses' failure to specifically identify the laptop, the Barbie

dolls, and the DVDs constitutes a false oath or account that was made knowingly and

fraudulently.

      The failure to specifically describe assets by itself does not constitute a false oath. The

type of asset at issue and the value placed on it are factors that clearly bear on whether a failure to

specifically describe an asset constitutes a false oath or accounting.[51] The Peepleses' response to

directive 5 essentially mimics the language of the directive, listing broad categories such as

books, pictures, and collectibles, rather than specific items within those categories. Although the

DVDs could perhaps be considered collectibles, the Peepleses testified that they omitted the

DVDs from Schedule B because they had minimal value and the Peepleses mistakenly believed

---

[50] The appropriate directive to list the laptop would not have been directive 5, but
directive 4, which instructed debtors to list, among other things, computer equipment.

[51] The Court notes that some of the directives contained in Schedule B, such as 9, 10, 11,
12, 13, 14, 17, 18, 21, 22, 23, 32, and 35, specifically direct that particulars or itemizations be
provided. Directive 5 has no such command. Greater specificity on one's schedules is preferable,
but choosing to list property in broad categories is not by itself evidence of a false oath where the
directive uses those broad categories and does not ask the debtor to give particulars or itemize.

that the DVDs may have been exempt.[52] They omitted the laptop for similar reasons.[53] Although

the Court assigns little weight to the explanations the Peepleses gave for leaving out the DVDs

and the laptop, the Court cannot infer a fraudulent intent from the failure to list a somewhat

shoddy computer—Mrs. Peeples described it as "always kind of fidgety"—purchased for $200 or

less two years before bankruptcy and a collection of used DVDs bought for $1 or $2. Based on

the evidence presented, the omission of these items from Schedule B appears to be more likely

the result of a mistake on the Peepleses' part than an intentional act.

  The valuation of a generally-described asset is a different consideration. The Lees

contend that if the Barbie dolls are included in the "collectibles," the valuation is a false oath or

account because the value of the unidentified Barbie dolls and DVDs must be more than

$20.00.[54] The Court concludes, based on the evidence presented at trial, that there was a

reasonable basis to value the assets identified in directive 5 at $20.00. First, the Court notes that

there was no evidence of value presented with respect to the listed books, pictures, wall

hangings, knickknacks, etc. The Lees introduced no evidence regarding what items the Peepleses

owned in those categories or their quantity or condition. It is not inconceivable that these items

have no value, and the Court cannot simply infer a value. Second, assuming that Mrs. Peeples's

Barbie dolls were included in the collectibles category, the $20.00 value the Peepleses assigned

---

[52] *See* Trial Transcript for June 28, 2017, at 339:17-340:20 and 378:13-21. The Peepleses'
assertion that they did not list the DVDs because they thought they may have been exempt is not
credible. As Mr. Lee showed, the Peepleses listed property on Schedule B that they claimed as
exempt on Schedule C. Nor is the explanation that the Peepleses did not list property of minimal
value particularly credible. They listed a TV valued at $5.00 on their Schedule B.

[53] *See* Trial Transcript for June 28, 2017, at 338:17-339:16.

[54] The Court has already discussed that the DVDs were not included in Schedule B.

to the items in directive 5 may be low on the possible range of values, but it is not unreasonable. The Peepleses had 16 Barbie dolls when they filed bankruptcy. Nine were dolls that Mrs. Peeples or her mother had modified in some way, including by altering the body of the doll, changing its hair, clothing it in a handmade dress, or painting its face. Those Barbie dolls appear to be nothing more than toys. Mr. Lee did not show that there is a market for such altered dolls or, even if there were, what such dolls would be worth on that market. The Court cannot infer a value for these dolls. The remaining seven dolls were not altered, but they were not in brand new condition. They had been removed from their boxes—which themselves exhibited wear—and had accumulated dust while sitting on shelves. Based on the evidence presented, the Court found that the value of these seven dolls is very low, perhaps no more than that of used toys, and there is no credible evidence that enables the Court to establish a higher value. The Court concludes that assigning a $20.00 value to all of the property in directive 5 is not unreasonably low. Accordingly, the description and valuation of the items in directive 5 is not a false oath or account.

The Court further concludes that the Peepleses' statement in response to directive 5 was not knowingly fraudulent. The Court may infer a fraudulent intent, but there must be some facts that provide a basis for the Court to make such an inference. There are none in this case. Mrs. Peeples had sold similar dolls in September 2012 at an average price of $5.00-$10.00 a doll,[55] and she believed that the dolls she retained were not worth very much. It is clear that Mrs. Peeples did not collect Barbie dolls for profit, but rather as a hobby. There is no evidence that the Barbie dolls had anything other than sentimental value to Mrs. Peeples. Mr. Lee essentially

---

[55] *See* Trial Transcript for June 28, 2017, at 383:15-384:6.

argues that the Court should infer that "collectibles" are valuable. But the Court cannot make

such an inference. Many collectibles, such as rocks, bugs, and sea shells have very little, if any,

value. The fact that Mrs. Peeples collected Barbie dolls does not establish that they have value.

Based on the Court's conclusion that the dolls may be worth no more than used toys, the Court

cannot infer a fraudulent intent in valuing the items in directive 5 at $20.00. Even assuming that

the Barbie dolls were included in the collectibles category, the items in directive 5 might be

worth, at most, marginally more than $20.00. That does not support an inference that the

Peepleses intended to defraud the trustee or creditors. Instead, it suggests that the valuation is the

result of a "mere inaccuracy," which is insufficient to deny the Peepleses' discharge under

§ 727(a)(4)(A). In addition, the Peepleses' alleged false statement in response to directive 5 was

not material. The difference in value is not significant in these circumstances.

The Lees also assert that the Peepleses failed to disclose income. While not expressly

stated, the Lees are apparently challenging the Peepleses' answers to questions 1 and 2 on their

Statement of Financial Affairs. The Lees contend that in 2012 the Peepleses had significant

income from the sale of Silver Eagle coins that they failed to disclose. The Lees also argue that

there is no rational or credible explanation why the vast majority of the gross income derived

from such activity did not become actual income at the end of 2012. What the Lees fail to

recognize is that they have the burden to show that the Peepleses' statement was false,

specifically that there was income that should have been disclosed and was not. The Court

concludes that they have not carried that burden.

Although PayPal records and bank statements were introduced into evidence, those

records and statements do not establish that funds deposited into the Peepleses' PayPal and bank

36

accounts were income. Because there was no competent witness to explain the PayPal records, the Court admitted them only for a limited purpose. But even without detailed explanation, the PayPal records show the duration of the accounts, that there were numerous debits and credits, and that the accounts at one time had negative balances in the approximate amount that the Lees contend was obtained from the sale of Silver Eagle coins. The Lees have contended that the Peepleses received income from the sale of Silver Eagle coins that were never delivered to the purchasers and that they did not make any entity whole in connection with that activity. They have also contended that eBay and PayPal reimbursed the purchasers for their losses and that eBay and PayPal should have been listed as creditors. Although the Lees failed to present sufficient evidence to prove these contentions, there is evidence that eBay or PayPal reimbursed some, or even all, of the purchasers of the Silver Eagle coins. The Peepleses' PayPal accounts reflected a negative balance when activity in the accounts ceased. Similar to bank accounts, if the Peepleses' withdrawals from their PayPal accounts resulted in a negative balance, the Peepleses may have a contractual obligation to repay this amount, and the withdrawals may not be income. But this Court can only speculate, and that is clearly not sufficient evidence for the Court to conclude that the PayPal account withdrawals were income when it is possible to conclude that the deposits were not income.

The Peepleses' answers to questions 1 and 2 of the Statement of Financial Affairs are not consistent with the directives contained in those questions,[56] but the Court concludes that the

---

[56] Question 1 asks debtors to list "[i]ncome from employment or operation of business," while question 2 asks for "[i]ncome *other than* from employment or operation of business." (emphasis added). Yet in response to question 2, the Peepleses listed $22,021.00 in net business revenue for 2011 and $0.00 for 2012-14, stating "no net revenue - no tax returns filed." Ex. 48, at 1.

answers were not made fraudulently. The Peepleses' answers to these questions do not evidence

any intent to conceal facts or income. The answers clearly disclose that the Peepleses had not

filed 2012 tax returns[57] because they believed they had no net income in 2012. Whether the

Peepleses should have filed a 2012 tax return is not an issue this Court needs to decide.

Even if false, the statements are not material. The Lees contend that the Peepleses failed

to disclose that they received approximately $30,000 in income in 2012, but the Lees have not

explained why that failure to disclose is material in the bankruptcy case. The Lees clearly imply

that the Peepleses have secreted this money away and it should be available for creditors, but

there is absolutely no evidence that this is the case. In fact, the evidence is that the Peepleses'

family of seven struggled to maintain their household in 2012, had no other income, and would

need this income for living expenses, including payment of rent to the Lees.

The Lees assert that Mrs. Peeples drew a paycheck via direct deposit from Silver Eagle

Store in the amount of approximately $5,000 per month. But the Lees did not attempt to prove

this assertion. In reviewing the exhibits that were admitted into evidence, the Court observed that

the Check 'N Go loan application did represent that Mrs. Peeples received $2,307.00 every two

weeks from Silver Eagle Store,[58] but that is insufficient evidence to conclude that she in fact

received that income.

The Lees also contend that the Peepleses made a false oath by failing to list eBay and

PayPal as creditors.[59] There was clearly insufficient evidence to establish that eBay and PayPal

---

[57] Whether the Peepleses were required to file income tax returns is not relevant.

[58] Ex. 24.

[59] *See* Docket No. 100, Plaintiffs' Motion for Summary Judgment Denying Discharge
Under 11 U.S.C. § 727(a)(4), at 2-3, 16.

38

were creditors at the time the Peepleses filed bankruptcy, and there was no evidence that the

Peepleses' failure to list eBay and PayPal was knowing, fraudulent, or material. The Lees have

also contended that the Peepleses failed to disclose, in response to question 19(d) on the

Statement of Financial Affairs, two financial statements that they issued to financial institutions

within the two years immediately preceding the commencement of their bankruptcy case.[60] The

two financial statements are the mortgage loan application made to Republic Mortgage Home

Loans in September 2012 and the Check 'N Go loan application filled out by Mrs. Peeples. The

Lees assert that the failure to disclose these applications was in furtherance of the Peepleses'

attempt to conceal their 2012 income. The Lees' contentions are completely meritless. The loan

applications the Lees have identified were clearly not "financial statements." Other than

statements regarding income, there is no financial information contained in those loan

applications. Moreover, the Lees presented no evidence that would suggest that the failure to

disclose the applications was fraudulent. That the Peepleses did not list two cursory, half-hearted

loan applications from 2012 that were subsequently denied is evidence more of inadvertence than

of a knowing and fraudulent attempt to conceal income.

     Last, the Lees have asserted that the Peepleses' discharge should be denied because they

made false statements in their 2004 exams.[61] There was no evidence presented to support this

claim, and there was no evidence that any alleged false statements related to the bankruptcy case

or were made in or in connection with the bankruptcy case. The Court denied the Lees' motion to

admit the entire 2004 exam as evidence and informed Mr. Lee that he could use specific portions

---

[60] *Id.* at 2-3, 17; *see also* Docket No. 222, Pre-Trial Order, at 6.

[61] *See* Docket No. 58, Plaintiffs' Supplemental Complaint, at 14.

of the 2004 exam during his examination of the Peepleses, if appropriate. Mr. Lee never

attempted to use any portion of the 2004 exam during his questioning.

Because the Lees failed to carry their burden on their § 727(a)(4) claim, the Court will

enter judgment for the Peepleses on that claim.

### 4. The § 727(a)(5) Claim

Section 727(a)(5) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

> (5) the debtor has failed to explain satisfactorily, before
> determination of denial of discharge under this paragraph, any
> loss of assets or deficiency of assets to meet the debtor's
> liabilities.

"A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts

establishing that a loss or shrinkage of assets actually occurred."[62] The plaintiff "must introduce

more than merely an allegation that the debtor has failed to explain losses. The plaintiff must

produce some evidence of the asset losses."[63] If the plaintiff carries this burden, "the burden then

shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner."[64]

The Lees contend that the funds the Peepleses derived from their online activities through

PayPal and eBay in 2012 are unaccounted for, and because the Peepleses cannot remember what

they did with those funds, they therefore have failed to explain satisfactorily a loss or deficiency

---

[62] *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[63] *Carter Eng'g Co. v. Carter (In re Carter)*, 236 B.R. 173, 180 (Bankr. E.D. Pa. 1999).

[64] *In re Stewart*, 263 B.R. at 618.

40

of assets to meet their liabilities. In particular, the Lees focus on the disposition of $29,298.00 in

withdrawals from the bank account of Silver Eagle Store in March 2012.

As they have consistently done in this case, the Lees exaggerate the significance of the

purported income at issue. The Lees make much of the Peepleses' lack of memory regarding

what happened to the funds.[65] But the majority of the purported 2012 income the Lees have

identified was received more than two years before the Peepleses' bankruptcy case, and the

amount of income at issue was not even great enough to place the Peepleses above the federal

poverty guideline for 2012.[66] Whatever income the Peepleses received from their online activities

was likely consumed by the ordinary, day-to-day expenses of maintaining a seven-person

household, particularly one that was incurring a $3,000 per-month rent expense. By late June

2012, the Peepleses had essentially run out of funds, and Silver Eagle Store was not profitable

enough to support them. There is no loss of assets in this case. The Court will enter judgment for

the Peepleses on this claim.

### 5. The § 727(a)(6) Claim

Section 727(a)(6) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

---

[65] Mr. Peeples testified that he used the $29,298.00 to purchase more coin inventory, which he sold. Trial Transcript for June 28, 2017, at 354:1-15. Of course, this explanation raises the question of what happened to the sale proceeds.

[66] The federal poverty guideline for a family of seven in 2012 was $34,930. 2012 Poverty Guidelines, 77 Fed. Reg. 4,034-4,035 (Jan. 26, 2012). The Court takes judicial notice *sua sponte* of this guideline pursuant to Fed. R. Evid. 201. The guideline is "not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," i.e., the Federal Register. Fed. R. Evid. 201(b)(2).

(6) debtor has refused, in the case–
    (A) to obey any lawful order of the court, other than an
    order to respond to a material question or to testify.

Refusal, within the context of § 727(a)(6), does not mean that a debtor merely failed to comply with a court order; rather, the debtor's non-compliance must have been willful.[67] In other words, § 727(a)(6) requires an intent to disobey a court order.[68]

The Lees' § 727(a)(6) claim is another claim that merits very little discussion. As with the § 523(a)(4) claim, the Lees omitted any discussion of this claim in their pretrial brief and presented no evidence in support of it at trial. The Lees' § 727(a)(6) claim is based entirely on the Peepleses' failure to provide their pre-discovery disclosures by the date stated in the Court's scheduling order entered on December 17, 2014. Although the Court was dubious of this claim, the Court permitted the Lees to amend their complaint to include it because the Peepleses did not object to amendment.[69]

The Lees have no claim under § 727(a)(6) for two primary reasons. As a legal matter, the order in question was not issued "in the case"; it was a scheduling order in this adversary proceeding. Section 727(a)(6) is clearly limited to a debtor's refusal to obey a court order "in the case," meaning the bankruptcy case, not adversary proceedings. Accordingly, the scheduling order is outside the scope of § 727(a)(6). The Federal Rules of Civil Procedure provide remedies for failures to comply with discovery requests and deadlines, and those remedies do not include a

---

[67] *Standiferd v. U.S. Trustee (In re Standiferd)*, 641 F.3d 1209, 1212 (10th Cir. 2011).

[68] *See Davis v. Osborne (In re Osborne)*, 476 B.R. 284, 297 (Bankr. D. Kan. 2012) ("[R]efusal, as opposed to simple failure, requires intent.").

[69] *See* Docket No. 57, Order Granting Plaintiffs' Motion to Permit Supplemental Complaint.

claim under § 727(a)(6). And as a factual matter, the Lees failed to present any evidence that the

Peepleses willfully refused to obey the scheduling order.[70]

## V. CONCLUSION

This case is, at its core, nothing more than a claim for unpaid rent. Yes, the Peepleses lied

about the rent check being in the mail. But soon thereafter, the Lees became aware that the

Peepleses could not pay the agreed rent and were facing financial difficulties. The Lees

nevertheless entered into a contract to sell the House to the Peepleses for $655,000.00. Given the

knowledge they had, there was no reason for the Lees to believe the Peepleses had the ability to

qualify for financing to purchase the House. The Lees have not shown that the Peepleses'

misrepresentation about the single rent payment caused them any damages and have not shown

that the Peepleses' failure to purchase the House caused them any damages.

Although the Peepleses personally failed to preserve recorded information, there are

records of their business transactions. Because the records were created by third parties and are

available to the Peepleses, they were justified in their failure to personally preserve copies of

these records. And there are sufficient records and sufficient evidence for this Court to ascertain

the Peepleses' business transactions and financial condition. Silver Eagle Store was a short-lived,

unsuccessful business venture that did not generate sufficient income to pay the Peepleses' living

expenses. The evidence is clear that during the two years prior to the Peepleses' bankruptcy, they

had no significant assets and no excess income. Despite their best efforts, the Lees have failed to

---

[70] The Court notes that the Peepleses were represented by counsel at the time initial
disclosures were due.

carry their burden on any of their claims. Accordingly, the Court will enter judgment for the

Peepleses and grant their discharge. A separate Order and Judgment will be entered in

accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

**_____ooo0ooo_____**

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below:

**By Electronic Service:**  I certify that the parties of record in this case as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing Order through the CM/ECF system:

Adrian James Lee     alee@wnlaw.com, adranglee@msn.com,adrlee@aol.com

**By U.S. Mail -** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

Adam L. Peeples
Jennifer K. Peeples
3739 So. Washington Loop, Apt B
Magna, UT 84044